J. A04001/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :     IN THE SUPERIOR COURT OF
                                               :              PENNSYLVANIA

                   v.                :

                                                 :

MICHAEL JOSEPH GROVE,          :          No. 1183 WDA 2014
                                                 :

             Appellant      :

Appeal from the Judgment of Sentence, July 3, 2014,
in the Court of Common Pleas of Washington County
Criminal Division at No. CP-63-CR-0001264-2012

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND SHOGAN, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED AUGUST 12, 2016**

Michael Joseph Grove appeals the judgment of sentence in which the Court of Common Pleas of Washington County sentenced him to serve a term of five to ten years' imprisonment for sexual assault, 18 Pa.C.S.A. § 3124.1, and a consecutive term of two and one-half to five years' imprisonment for indecent assault by forcible compulsion or threat of forcible compulsion, 18 Pa.C.S.A. § 3126(a)(2), for a total term of imprisonment of seven and one-half to fifteen years.

The facts as recounted by the trial court are as follows:

> During trial, the jury heard evidence that on April 14, 2012, "Victim") was participating in a social event at an on campus residence following California University of Pennsylvania's annual alumni rugby game when she was assaulted by Michael Joseph Grove (hereinafter referred to as [appellant]. At the

time of the incident, Victim was a freshman at California University of Pennsylvania.

On the morning of April 14, 2012, Victim was participating in a rugby event at the University. During the course of the rugby match, Victim encountered [appellant], who was serving as a referee. Victim testified that there was alcohol present at the game, but she did not imbibe any alcohol.

After the matches concluded, members of the team and the alumni, including Victim, returned to a residence that was referred to as the "rugby house." Victim did not reside at the rugby house. Victim and some fellow teammates then attended a social event held for the alumni game at McMonagle's Pub nearby.

Victim testified that alcohol was served at the pub, but Victim did not drink any alcohol. Victim testified she was given a wristband by the pub to indicate she was not twenty-one (21) years of age. Victim testified that she again encountered [appellant] at the pub. Victim explained that although she did not know [appellant] by name, when she saw [appellant] at the pub she recognized him as the rugby referee and they acknowledged one another by nodding heads at each other. She further testified that as she proceeded to walk by [appellant], he tapped Victim on her butt.

Later that evening, Victim joined other members of the male and female rugby teams and left the pub and returned to the rugby house. While at the rugby house, Victim re-encountered [appellant] as she stood in the kitchen waiting to use the bathroom.

Victim made conversation with [appellant] until the bathroom became available. Victim stated to [appellant] that he did a poor job of refereeing the rugby match. At that point, [appellant] grabbed Victim's arm and pulled her close to him and he said

to her, "let me make it up to you." Victim tried pushing [appellant] away, but he continued to pull her close to him and repeating [sic] "let me make it up to you." Victim testified that the actions made her uncomfortable and she tried telling [appellant] she was gay to turn him off.

The bathroom door opened and [appellant] quickly dropped his grasp of the Victim. Victim's friend Rachel Schleicher exited the bathroom. After Ms. Schleicher exited the kitchen, Victim testified that she was immediately forcibly drug [sic] into the bathroom by [appellant]. Victim further testified that the bathroom door was locked behind her. Victim indicated that the incident happened very quickly and she did not yell for help. Victim also indicated that there was no one in the kitchen to yell to for help. She indicated that the television and music were being played loudly from the other room and did not believe anyone would hear her.

Victim testified that after the bathroom door was shut and locked behind her, [appellant] began kissing her face. Victim testified that she attempted to push away from [appellant]. However, [appellant] began touching her vaginal area. Victim indicated she had spandex on under her sweatpants, so [appellant's] hand, despite his efforts, did not come into skin contact with her vaginal area. Victim continued to try to push away, but [appellant] kept pulling her close to him with one hand. Victim further testified that [appellant] continuously attempted to force Victim to touch and stroke his penis. [Appellant] then grabbed Victim's pigtail and tried shoving his penis into her mouth. However, Victim testified that she kept her mouth shut, so [appellant's] penis touched her lips and teeth, but did not pass that point into her mouth. Testimony demonstrated that after [appellant] was unsuccessful in putting his penis into Victim's mouth, he began kissing her neck and ear.

Victim testified that during the assault she began trying to find her cell phone to reach out for

help. Victim indicated that she found her phone and texted her friend, Rachel Schleicher. Victim testified that she had exchanged text messages with Ms. Schleicher earlier in the day, so her name was [at] the top of her text message list. Testimony demonstrated that Victim held her phone away from her body for fear that [appellant] would see her. Therefore, Victim was blindly attempting to text message Ms. Schleicher "Help." However, Victim's first attempted text message to Ms. Schleicher spelled out the word "hall." Following the word "hall," Victim typed "help plz."

Ms. Schleicher testified that she was sitting in a bedroom with Ashley Dixon when she received a text message from the Victim. Ms. Schleicher responded to the message and inquired where Victim was located. Victim responded via text message that she was in the bathroom. Soon thereafter, Ms. Schleicher began knocking on the door and attempting to enter the locked bathroom.

As soon as Ms. Schleicher began pounding on the bathroom door, [appellant] threw Victim off of him and pushed her into the corner. Ms. Schleicher then yelled out "let me in or I'm going to have to break in." Ms. Schleicher testified that she ran to get a butter knife to try to unlock the door. Defendant then proceeded to unlock the door and exit. As Ms. Schleicher is [sic] retrieving the butter knife, she testified that the door opened and [appellant] was standing in the doorway.

Victim testified she remained on the bathroom floor and began hysterically crying. Ms. Schleicher consoled her. Victim then texted her boyfriend, Joseph Arafa, who came to the house. Testimony demonstrated that at some time after Ms. Schleicher left the bedroom, [appellant] came in and began talking to Ashley Dixon. Ms. Dixon testified that [appellant] stated "someone should go get that girl, she is pretty drunk." As Victim was exiting the bathroom, Victim saw [appellant] sitting on a bed in a bedroom talking to Ms. Dixon. Victim then

informed Mr. Arafa and Ms. Schleicher that [appellant] had assaulted her. Ms. Schleicher then began yelling for [appellant] to get out of the house.

Victim remained at the house as the police were called to the scene. Officer Timothy Sheehan, of the California Borough Police Department, arrived at the scene and testified that when he arrived the Victim was crying hysterically. He took a verbal statement from the Victim. Officer Sheehan further testified that the Victim came to the police station the next day or so and gave a written statement. Based on the information received, Officer Sheehan filed criminal charges against [appellant].

Trial court opinion, 7/9/15 at 5-9 (footnotes omitted).

The jury found appellant guilty of the two charges on which he was sentenced and not guilty of the charges of involuntary deviate sexual intercourse by forcible compulsion, 18 Pa.C.S.A. § 3123(a)(1), and simple assault, 18 Pa.C.S.A. § 2701(a)(1).

Appellant raises the following issues for this court's review:

I.      DID THE TRIAL COURT ERR IN PERMITTING TERTIMONY [SIC] THAT APPELLANT HAD GRABBED OR TOUCHED THE BUTTOCKS OF WOMEN OTHER THAN THE VICTIM ON THE NIGHT OF THE INCIDENT IN QUESTION?

II.     DID THE TRIAL COURT ERR IN PERMITTING THE COMONWEALTH [SIC] TO REPEATEDLY ELICIT TESTIMONY THAT APPELLANT WAS KNOWN AS "CHESTER" OR HAVE IT'S [sic] WITNESSES REFER TO APPELLANT BY THE NICKNAME "CHESTER" AND IN NOT GRANTING APPELLANT'S MOTION FOR MISTRIAL?

III.    DID THE TRIAL COURT ERR IN NOT PERMITTING TRIAL COUNSEL TO INTRODUCE TWEETS THAT COULD HAVE BEEN PROVEN TO

> BE WRITTEN BY ALLEGED VICTIM AFTER THE INCIDENT THAT FORMED THE BASIS OF THE CHARGES AGAINST APPELLANT, IN WHICH SHE TALKED ABOUT SMOKING KUSH[1] AND CONSUMING ALCOHOL, WHERE THE COMMONWEALTH INTRODUCED EVIDENCE OF HER CONDITION AFTER THE INCIDENT, WHICH WAS INCONSISTENT WITH THE STATEMENTS MADE IN SAID TWEETS?

Appellant's brief at 5.

This court's standard of review regarding the admissibility of evidence is as follows:

> Our standard of review regarding the admissibility of evidence is an abuse of discretion. The admissibility of evidence is a matter addressed to the sound discretion of the trial court and . . . an appellate court may only reverse upon a showing that the trial court abused its discretion. An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.

**Commonwealth v. Cox**, 115 A.3d 333 (Pa.Super. 2015). The standard of review for the admission of prior bad acts is also an abuse of discretion standard. **Commonwealth v. Trippett**, 932 A.2d 188 (Pa.Super. 2007).

Initially, appellant contends that the trial court erred when it permitted testimony that appellant had grabbed or touched the buttocks of women other than the victim on the night of the incident in question. The trial court did not order the redaction of any reference to other women and did not issue a cautionary jury instruction. Further, appellant alleges that the trial

---

[1] "Kush" refers to high grade marijuana.

court failed to weigh the probative value of the evidence versus the prejudicial effect on appellant as required under Pa.R.E. 403. Appellant also argues that the Commonwealth failed to comply with Pa.R.E. 404(b)(3) because it did not provide notice that it intended to introduce evidence of appellant's bad acts.

Specifically, appellant points to two separate incidents during the course of the trial. First, the Commonwealth chose to have the victim read the entire statement which she gave to the police in open court:

> After the tournament, there was a social for all teams and sirs[2] to attend at McMonagle's Pub. While the teams, as well as [appellant] was at the pub, [appellant] made sexual remarks and kept grabbing my buttocks. But this was not happening only to myself but to other teammates and other girls.

Notes of testimony, 12/9/13 at 164.

Prior to the reading of this statement, appellant's counsel objected on the basis that touching other women was "other criminal conduct" as an indecent assault. (*Id.* at 158.) The trial court overruled the objection.

Second, appellant refers to testimony from Meaghan Juba ("Juba"), another rugby player, who testified regarding appellant's touching the

---

[2] In rugby, the referee is known as "sir."

J. A04001/16

buttocks of women at McMonagle's.[3]  Appellant's counsel objected.  The trial

court overruled the objection.

Regarding the two statements, the trial court opined:

> During cross examination, Victim was questioned at length about her recollection of the events of April 14, 2012.  Further, Victim was questioned several times by defense counsel about her written statement in connection with what she had testified to on direct examination.

---

[3] The Commonwealth questioned Juba:

> Q:    Is there anything you remember about [appellant] at McMonagle's?
>
> A:    Yeah.  He was going around . . . trying to pick up some girls, but grabbing butts as well.
>
> Q:    What do you mean by grabbing butts?
>
> A:    Well, a couple times when I wasn't paying attention, I would feel someone walk by and grab my butt.  It was kind of like a grab.  And I would turn around and kind of give him . . . like a what are you doing look, like who are you.  And he would kind of look at me and walk away.  He was doing that to other girls at the bar.
>
> . . . .
>
> Q:    Did you know anyone else, in particular, other than yourself, that he grabbed their butt?
>
> A:    I saw him grab the victim's and Dixon's and Rachel's, but not like too, too much.  I mean, there is a lot . . . grabbing going on at bars, so nothing out of the ordinary too, too much.

*Id.* at 310-311.

The Trial Court submits that the written statement read into evidence by Victim was admissible as a prior consistent statement as rebuttal to the cross-examination questions attempting to paint the statement as a prior inconsistent statement.

> Pennsylvania Rule of Evidence 613(c) states:
>
> Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
>
> (1) Fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
>
> (2) Having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

In ***Commonwealth v. Swinson***, 626 A.2d 627 (Pa.Super. 1993), the Pennsylvania Superior Court determined that a detective was permitted to read from his report statements made to him by a victim/witness during an interview regarding the incident in question. The Superior Court opined that the witness was subject to extensive cross-examination and that the statement was merely a prior consistent statement offered to rehabilitate the witness, whose credibility was attacked.

The Trial Court finds the *Swinson* reasoning analogous and persuasive to the matter at bar. A review of the transcripts revealed that the Victim was subject to extensive cross-examination of her recollection of the events on April 14, 2012, with the design of casting doubt on her memory and general credibility. Defense counsel, by bringing out inconsistencies in the Victim's testimony, clearly advanced the issue of Victim's credibility. Therefore, it was not error for the Trial Court to permit the Victim to read her written statement that she made to the police in order to rehabilitate and rebut any claim of inconsistency with respect to her prior testimony.

. . . .

[A]ppellant asserts the Trial Court erred in permitting the testimony of Commonwealth witness Megan [sic] Juba. . . . [Appellant] claims that such conduct was uncharged criminal conduct and the Commonwealth provided no notice and the testimony was extremely prejudicial.

. . . .

Preliminarily, the Trial Court reiterates that evidentiary decisions will not be disturbed absent an abuse of discretion. During direct examination of Victim, the prosecution introduced evidence that [Appellant] had "tapped" the Victim on the butt at McMonagle's Bar, prior to the assault in question. No objection to the questioning was lodged by defense counsel. On cross-examination of the Victim, the matter was rekindled by defense counsel. However during redirect examination of Victim, defense counsel stated an objection asserting that any testimony or evidence that [Appellant] touched the buttocks of other individuals, not a party to this matter, should be barred as it is uncharged criminal conduct. The Trial Court reasoned that it was appropriate to enter evidence of [Appellant] touching and grabbing butts of people other than the Victim, on the evening in question.

Initially, the Trial Court observed that during cross examination of Victim, defense counsel alleged that the Victim consented to the assault by inferring that because Victim was touched on the butt at the bar, she should have been fearful of [appellant] later that evening. Defense counsel urged that in the kitchen of the rugby house, the Victim should have either left the room or cried out for help.

. . . .

The Trial Court submits that it did not abuse its discretion in admitting evidence of the [appellant] touching and/or grabbing butts of individuals other than the Victim, during the course of the evening in question. During cross examination of Victim, defense counsel attempted to present a defense that the Victim consented to the activity. Defense counsel asked numerous questions as to why the Victim did not run away or yell for help after she knew that the [appellant] had already grabbed her butt at the bar. This line of questioning inferred that because [appellant] grabbed her butt at the bar, she should have been alarmed and fearful of him later in the evening when they were alone in the kitchen. Testimony demonstrating that [appellant] grabbed the buttocks of others exhibited that there was no indication to Victim that the [appellant] was targeting her. Accordingly, there was no reason for her to be on guard that there may be an impending sexual assault. Moreover, such evidence showed a lack of consent and that the grabbing was not a prelude to consensual sexual activity, rebutting any inference by the defense that the Victim consented to sexual contact.

> We have recognized that evidence of prior bad acts or crimes may be admitted to show motive, intent, absence of mistake or accident, common scheme, plan, or design, or identity of the perpetrator of a crime. In addition, evidence of other crimes may be

introduced where such evidence was part of the chain or sequence of events which became part of the history of the cases in question and formed part of the natural development of the facts.

The evidence demonstrates [appellant's] motive and completes the picture of the actual events of that night and the natural development of the facts of the case. It [is] well established that:

Pennsylvania courts are not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged."

After careful consideration, the probative value of the evidence that the [appellant] grabbed the butt of the individuals other than the Victim outweighs any potential for prejudice. "Evidence of uncharged crimes of the most serious and offensive nature has been admitted pursuant to the **res gestae** exception." The prior bad acts in question were not serious and offensive and were not described as such. The [appellant] is not being tried in a vacuum and the evidence did not invite the jury to determine the matter on an improper basis. Therefore, there was no abuse of discretion here.

Trial court opinion, 7/9/15 at 24-25, 34-35, and 37-38 (footnotes and citations omitted).

This court finds no abuse of discretion by the trial court. First, as the Commonwealth and the trial court stated, the evidence was not introduced to establish appellant's bad character in violation of Pa.R.E. 404. The Commonwealth offered the evidence to counter the argument that the

sexual assault was consensual because appellant earlier had grabbed the victim's buttocks and that her failure to yell or fight when he confronted her at the Rugby House indicated that she was willing to engage in sexual activity with appellant. This evidence indicated that while appellant grabbed the victim's buttocks, he did the same to other people.

Second, the Commonwealth did not need to provide notice of its intention to introduce this evidence because the Commonwealth only did so in response to the appellant's argument that the sexual activity was consensual. As the trial court stated, appellant opened the door to this evidence when he suggested that the victim was aware that appellant was targeting her by this action. Evidence that he grabbed the buttocks of other women refuted this contention. Third, this court finds that the trial court did not abuse its discretion when it determined that the probative value of the evidence outweighed the prejudicial effect.

Appellant next contends that the trial court erred when it permitted the Commonwealth to repeatedly elicit testimony that appellant was known as "Chester" or have the Commonwealth's witnesses refer to appellant as "Chester" and when it failed to grant a mistrial. Appellant argues that the use of the name "Chester" is a shortened version of "Chester the Molester" and the use of the name "Chester" when referring to appellant was so prejudicial that a mistrial should have been granted. Appellant asserts that a "Google" search on the internet of "Chester the Molester" resulted in

103,000 results including a Wikipedia entry that "Chester the Molester" was a comic character in Hustler magazine who was known for molesting women.

The victim testified that she had heard that appellant was called "Chester." (Notes of testimony, 12/9/13 at 36.) Appellant moved for a mistrial which was denied. Later, Ashley Dixon also referred to appellant as "Chester." (*Id.* at 262.)

The trial court explained:

> The Trial Court submits that the unsolicited remark from the Victim did not rise to the level of depriving the [appellant] of a fair and impartial trial and there was no ground for a mistrial.
>
> In the second instance, the Commonwealth witness, Ashley Dixon, repeatedly referred to [appellant] by his last name, "Grove." The prosecution queried whether Ms. Dixon always referred to the [appellant] by his last name. In response, Ms. Dixon stated that she previously referred to the [appellant] as "Chester." Defense counsel again made a motion for mistrial.
>
> The Trial Court observes that, "the remedy of a mistrial is an extreme remedy required 'only when an incident is of such nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.'" The Trial Court asserts that the prosecution had a good faith basis for the question and that the mere passing reference of the name "Chester" did not inflame the passions of the jury such that [appellant] would be deprived of his right to a fair and impartial jury. Accordingly, the Trial Court discerned no prejudice to the [appellant] and likewise found no grounds for a mistrial. (Footnote omitted.)

Trial court opinion, 7/9/15 at 16.

The standard governing our review of a trial court's refusal to grant a request for a mistrial has been previously well summarized by this Court:

The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a "flagrant abuse of discretion." ***Commonwealth v. Cottam***, 420 Pa.Super. 311, 616 A.2d 988, 997 (1992); ***Commonwealth v. Gonzales***, 415 Pa.Super. 564, 570, 609 A.2d 1368, 1370-71 (1992). A mistrial is an "extreme remedy . . . [that] . . . must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial." ***Commonwealth v. Vazquez***, 421 Pa.Super. 184, 617 A.2d 786, 787-88 (1992) (citing ***Commonwealth v. Chestnut***, 511 Pa. 169, 512 A.2d 603 (1986), and ***Commonwealth v. Brinkley***, 505 Pa. 442, 480 A.2d 980 (1984)).

***Commonwealth v. Stilley***, 455 Pa.Super. 543, 689 A.2d 242, 250 (1997).

***Commonwealth v. Bracey***, 831 A.2d 678, 682-683 (Pa.Super. 2003), ***appeal denied***, 844 A.2d 551 (Pa. 2004).

Here, this court finds no abuse of discretion by the trial court. Despite appellant's references to his "Google" search which, incidentally, is not part of the record, there is no indication that the jury understood that the name "Chester" could have the meaning ascribed to it by appellant.

Next, appellant contends that the trial court erred when it did not permit appellant to introduce "tweets" where the victim talked of smoking

"kush" and consuming alcohol where the Commonwealth introduced evidence of the victim's condition after the incident which was inconsistent with the statements in the "tweets." Because the Commonwealth portrayed the victim as a non-drinking, damaged individual following the incident with appellant, appellant argues that it should have been permitted to place the "tweets" into evidence.

Appellant attempted to introduce this evidence during the cross-examination of the victim's boyfriend, Joe Arafa, who testified that the victim did not drink or use marijuana.

The trial court determined:

> Defense counsel did not inquire during cross examination of the Victim if she had been affected by her encounter with the [appellant] or whether since the encounter she drinks alcohol or uses drugs. Later, during direct examination of Mr. Arafa, testimony was elicited as to how he has seen the Victim affected by the assault and whether she had become introverted. Thereafter, defense counsel argued he should be permitted to submit evidence that the Victim has not become introverted because an unauthenticated twitter message states she drinks alcohol and smokes marijuana.
>
> Developing an inference through Mr. Arafa's testimony that the Victim's encounter with the [appellant] must have been consensual due to an unauthenticated twitter message from Victim is not admissible. There were no facts in evidence that the Victim ever used drugs or whether she has consumed alcohol since the assault. Moreover, the defense did not question the Victim in this regard. Instead, defense sought to impeach Mr. Arafa about his personal knowledge of the Victim which was an issue not material to this matter. Therefore, the

> Trial Court found this to be a collateral issue and not admissible.
>
> Defense counsel was given wide latitude to cross-examine Mr. Arafa to test his recollection of those events. The defense had similar latitude for cross-examination of the Victim. For the reasons stated above, the Trial Court did not abuse its discretion and asserts this claim of error has no merit.

Trial court opinion, 7/9/15 at 41-42 (footnote omitted).

Appellant argues that the tweets could have cast doubt on the Commonwealth's evidence regarding the current state of the victim's mental health.

This court agrees with the trial court that the trial court did not abuse its discretion. Appellant does not explain how the fact that someone drank alcohol or smoked marijuana would indicate the state of their mental health. Further, the alleged tweet was posted approximately one year after appellant's assault. The question of whether the victim consumed alcohol a year after the assault is not probative of whether or not she was attacked by appellant.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/2016

- 17 -